IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


```
* * * * * * * * * * * * *   CRIMINAL ACTION
UNITED STATES OF AMERICA  *   13-133S
                          *
VS.                       *   FEBRUARY 25, 2014
                          *
SCOTT NIEMIC              *   PROVIDENCE, RI
* * * * * * * * * * * * *
```


HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

CHIEF JUDGE

(Sentencing)


**APPEARANCES**:

```
FOR THE GOVERNMENT:        PAUL F. DALY, JR., AUSA
                           U.S. Attorney's Office
                           50 Kennedy Plaza
                           Providence, RI  02903

FOR THE DEFENDANT:         KEVIN J. FITZGERALD, ESQ.
                           Federal Defender's Office
                           10 Weybosset Street
                           Suite 300
                           Providence, RI  02903

Court Reporter:            Anne M. Clayton, RPR
                           One Exchange Terrace
                           Providence, RI  02903
```


Proceeding reported and produced by computer-aided
stenography

25 FEBRUARY 2014 -- 2:15 P.M.

THE COURT:  Good afternoon.  This is the matter of the United States versus Scott Niemic.  We're here for sentencing this afternoon.

Let's have counsel identify themselves for the record.

MR. DALY:  Good afternoon, your Honor.  On behalf of the Government, Assistant United States Attorney Paul Daly.

MR. FITZGERALD:  Kevin Fitzgerald for Mr. Niemic.

THE COURT:  Thank you.

Mr. Fitzgerald, would you just confirm on the record that you've had the opportunity to review the Presentence Investigation Report with your client and you've been able to answer all of his questions.

MR. FITZGERALD:  Yes, your Honor.

THE COURT:  Are there any objections to the presentence report?

MR. FITZGERALD:  No, your Honor.

THE COURT:  Any from the Government?

MR. DALY:  No, your Honor.

THE COURT:  All right.  Then I'll accept the presentence report and utilize it for purposes of sentencing this afternoon.

I'm going to outline the advisory guideline calculations as set forth in the presentence report.

Begin at Paragraph 18, Group 1, which is Count I, base offense level is 20.  There's a two-point upward adjustment because property of a financial institution was taken; another two-point upward adjustment because the offense involved a threat of death; another two-point upward adjustment for reckless endangerment for an adjusted offense level of 26.

Group 2 contains essentially the same calculations.

Group 3 is also the same.

Group 4, same calculations; and Group 5 is also the same calculation.  All of these have adjusted offense levels of 26.

The combined offense level under the grouping rules yields an offense level of 30.  There's a three-point downward adjustment for acceptance of responsibility for a total offense level of 27.

The Defendant's criminal history is summarized in Paragraph 79.  He has eight countable criminal history points.  That places him in criminal history category of 5.

So at offense level 27 -- I misspoke.  It's category 4 -- criminal history category 4, the

Defendant's advisory guideline range is 100 to 125 months of incarceration.

So I'll hear first from the Government with respect to the appropriate sentence.

MR. DALY:  Thank you, your Honor.  We previously filed with the Court a brief sentencing memo indicating that the joint recommendation today would be 105 months incarceration.  The Government will be recommending 105 months incarceration for the following reasons, your Honor.  We ask always that the sentence here be sufficient but not greater than necessary to comply with the objectives of 18 USC 3553.

With regard to factors set forth at Section 3553(a), the Government asks that the Court consider the nature and circumstances of the offenses here.

Your Honor, each of the five robberies which the Defendant stands convicted for, co-mingles dominance and fear.  The crimes weren't just about the result of thievery.  He could have taken the money.  It's not just about the thievery but it's about controlling another's behavior to accomplish an objective.  In each instance, each of these five robberies, your Honor, a woman's life was changed.

After robbing the Eastern Bank on March 22nd of 2012, he returned to the bank to the very same teller

five days later; and when he returned he said those chilling words, your Honor, "I followed you home; I know where you live."

He operated that day as he did during each of these five events in a climate of dominance and fear.

As I spoke to the women who were robbed, your Honor, in anticipation of sentencing today a similar theme developed from each of them. They told me that they never look at people the same. Some had worked in banks for many years; some had worked just a few, but the common refrain from each, your Honor, is that they look at people more suspiciously. They have more anxiety at their workplace.

So what's the result? Your Honor, although each of those women are not being sentenced to prison, they did nothing wrong, they do -- excuse me, should they choose to remain in their occupation, and by and large they have chosen to, they're going to be sentenced to a workplace contaminated with anxiety and suspicion, a direct result of the nature and circumstances of the offense and the offenses that this Defendant engaged in.

What about the history and the characteristics of this Defendant, your Honor, another one of the 3553 factors. The Government asks that you consider the

following, your Honor.  The presentence report speaks to a history from adolescence to the present of a man who frequently engaged in thievery and drug use. Perhaps not coincidentally, perhaps it's not coincidental that these crimes appear almost hinged together in his record.

The presentence report speaks to a young man who had much promise, many accomplishments, and importantly both gave and received care and affection from loved ones.

I carefully read, your Honor, his letter to the Court, and it struck me that there was deep clarity there, and he spoke with deep clarity about his selfish conduct, which has led to incarceration and the forfeiture of so many things in his life.  But, your Honor, each selfish act described in the presentence report brought pain not just to him and his loved ones but to his victims, too, your Honor, who time and again for the past 20 years have had to come to grips with being a victim and the consequences that attach.

Your Honor, Section 3553 provides the sentence should provide needed medical treatment and needed medical care and appropriate.  The presentence report speaks to a period of drug abuse by the Defendant. Now, although the Defendant's criminal record spans

approximately 20 years, the drug addiction covers approximately ten years or half that period.  There was a substantial amount of criminal conduct which predated even his admitted significant drug abuse.

So to the extent that addressing Defendant's drug abuse may help to limit his future drug use and associated criminal activity, the Government calls for or asks for the Court to impose the appropriate sanctions.

With regard to the 3553 factor of deterrence, both general and specific, that certainly is a consideration that is appropriate in this circumstance, your Honor.

This Defendant individually needs to be deterred from further misconduct and a lengthy period of incarceration would certainly do that.  Also, too, there is an element of general deterrence in this case. This was a crime that received some attention in the media, probably will after sentencing.  The Defendant's behavior not only going from state to state engaging in bank robbery, but also leading law enforcement on a high-speed chase in excess of 100 miles an hour down the highway and down into city streets of Fall River was something that was notable in the community and I would expect that an appropriate sentence here,

hopefully, would be one that the community would take notice of and hopefully individuals poised to engage in some of the same type of criminal activity that this Defendant engaged in might reconsider should the sentence be significant.

Your Honor, Section 3553 also speaks to the need for a sentence to avoid unwarranted disparities among defendants with similar records and similar conduct.

There is, as your Honor pointed out, a sentencing range established for this conduct; and here, the Defendant's combined offense level, as the Court spoke to a moment ago, was arrived at by using the grouping method.  It results in essentially, your Honor, what is for sentencing purposes a discount for the Defendant after the first robbery.

In this case, your Honor, 80 percent of the Defendant's conduct, 80 percent that he's being sentenced for, occurred outside this district with the cooperation from district attorneys in Worcester, Plymouth and Norfolk County; the Rhode Island Attorney General's Office and the United States Attorney's Office in Boston.  This Defendant is dealing with a lot of bad conduct in this proceeding.  But like any good agreement, that is the Government agreed to bring all these charges together and the Defendant agreed to be

prosecuted here in this one place for all these offenses, like any good agreement there are benefits to both parties in handling the matter in this way, and the Defendant should be given consideration for that and he is.

What I suggest to the Court is the important take-away from this, your Honor, is where the guidelines fix a range for this conduct, the sentence should approximate what he would receive whether that sentence is pronounced here, in the District of Massachusetts or any other district.  If so, then the guideline objective of reasonable uniformity in sentencing can be attained.

Your Honor, in this regard, then, the parties agree that 105 months is a fair and just sentence, and we jointly recommend that to the Court.

We are also asking, your Honor, the Government is, that you order forfeiture in this matter of $8,696.  That is the amount that was identified in the indictment.  We ask that that amount be forfeited.

We also ask that you order that restitution in the amount of $6,503 be made to the TD Bank in Wellesley, Massachusetts.  The money $8,696, if forfeited, will go towards the payment of that restitution.

Your Honor, the Government is also asking that after sentence is pronounced we are going to ask that the associated indictment in this matter, 12-148S, be dismissed.  That was an earlier indictment.  The charge contained in that indictment is now contained in this information.  So we're going to ask that that be dismissed as well.

THE COURT:  I'm a little confused by your restitution request.  I thought the restitution amount was around $27,000?

MR. DALY:  Is that correct, your Honor?

THE COURT:  Well, each robbery had a separate amount.  You know, Eastern Bank was $8500; Sovereign, $8100; Rockland, $5,000; TD Bank, $5,000.

MR. DALY:  Your Honor, I was relying upon the presentence report in which requests were sent to each bank to indicate the amount that they would like in restitution, and TD Bank was the only one that responded affirmatively and that was where that figure came from.

THE COURT:  What happened to all the money then?  The amounts of money that you described don't add up to the amount that was actually stolen.  You talk about forfeiting around 8,000 and restitution around 6, which comes to about 14, but more than that was taken.

MR. DALY:  Agreed, your Honor.  My belief is that those banks have written that off as an insurance loss and not seeking restitution for it.

THE COURT:  Well, is that correct, there were no other restitution requests?

PROBATION OFFICER:  Your Honor, the only request received back was from TD Bank.  I would assume though they're all considered losses and someone should be paid for the losses from the banks.

THE COURT:  I think we have some time after sentencing to finalize the restitution order and so I think I'll do that in this case.  Somebody lost money here, even if the banks have written it off and the insurance companies have paid it.  So I think Probation or the Government should reach out to the banks that were robbed and figure this out.

MR. DALY:  Very well, your Honor.  I'll do that.

THE COURT:  Okay.  Thank you.

MR. DALY:  Thank you, your Honor.

THE COURT:  Mr. Fitzgerald.

MR. FITZGERALD:  Thank you, your Honor.  I'm sorry.  We're just trying to look at the dollar amount.

Mr. Niemic is obviously -- you've read his acceptance letter.  He's happy to accept whatever the restitution order is.  There was some money that was

seized from him, seized during the investigation and other money that was obviously used.

Your Honor, Mr. Niemic asks for or jointly requests for the 105 months incarceration just as the Government just said.  The only real request he has for his sentence, he asks that the Court recommend to the Bureau of Prisons that he be allowed to serve that as close to home as possible as well as also be recommended for the RDAP program, the drug program.

Mr. Niemic won't be benefiting from any time reduction on his sentence based on his participation in that, but obviously he understands that doing drug treatment while he's in is going to make a big difference on his ability to conform his behavior once he gets out, that he will be far more likely to be successful during supervised release if he participates in that drug treatment now.

Your Honor, Mr. Niemic feels horrible about what he did in these banks.  He feels horrible about how he made these tellers feel.  He can't take that back.  I'm sure he would if he could, but he can't.

I think if you look at his letter you'll see that the time he's been out there at the ACI, he's been out there for over a year-and-a-half, he has developed some insight into himself and what he's done, and I

think that that shows some growth that the Court should consider.

Clearly, before all this, he was a very hard working guy, fairly bright guy and fairly successful. His story is, unfortunately, becoming too common, getting involved with heroin, hooked on heroin through prescription medications.  The fact that he's not the only one, that doesn't make his situation any less, but he understands how he ended up here and he doesn't want to end up here again.

He's very ambitious.  You've seen the letters and pictures and everything that the family sent.  His family loves him.  His children adore him.  Obviously when he's not using drugs and the associated behavior there, he's a very good father and he wants to be back there.  That's what he wants to be, back home with his kids and taking care of his kids.  That's what he's striving for once he finishes this sentence.

Your Honor, I think you should just look at his letter and take his letter or consider it at face value.  He is remorseful about what he's done.  He understands what he did.  He gets it.

He's now been sober for some time that he's been there in the ACI.  He's used his time wisely.  He's tried to better himself with the opportunities that

presented itself there.  Keeping occupied, working.  I think he may have a certificate; he learned how to become a law clerk.  Prior to that, he was actually using some of his skills as a contractor, and he learned along the way to work on different parts of the Intake Center to prepare -- specifically I remember him preparing ceiling tiles in the visiting area when I was visiting other clients.

So he's made himself very useful out there and tried to keep occupied as opposed to perhaps just going into a corner and saying, "Woe, is me.  I made bad decisions, and I can't change the ground."

Judge, 105 months is a significant sentence.  He's going to be on supervised release for some time after that.  It's certainly plenty of time for the Court to impose for this particular crime.  So I'd ask you to impose what was jointly recommended here today.

THE COURT:  Okay.  Thank you, Mr. Fitzgerald.

MR. FITZGERALD:  Thank you.

THE COURT:  Mr. Niemic, would you like to say anything before I impose sentence?

THE DEFENDANT:  Yes, your Honor.  I would.

I know I've been an immeasurable source of pain to a lot of people and they deserve an apology.  I'm apologizing to all the staff at all the banks, the bank

tellers specifically and their families.

I'm apologizing to the people involved in the accidents connected to my arrest that I hit in flight of my ignorance and their families. They deserve an apology.

My family, especially my children who deserve a better father and role model than what I've given them; the community as a whole and this Court. Remorse and regret are not strong enough words to describe how I feel; and if I could turn back the clock, I would. I would probably turn it back a few years prior to this situation and make some major changes in direction in life. But I can't do that. So I hold myself responsible and accountable. I accept my punishment, and I deserve what I get. I do know that I can't change how my life started out, but I can change how it ends up.

Thank you.

THE COURT: So let me ask you a couple of questions. What's your plan for when you get out? How are you going to get yourself on the track that you hope to be on?

THE DEFENDANT: Well, I plan on becoming a published author. I plan on using this experience through writing, through speaking to people; and

especially being incarcerated at the ACI, this is my first adult incarceration and there are a lot of kids that are 18, 19 years old, and I can't help but realize that they remind me of my own son.

So outside of getting back into school and pursuing my trade background, I'm going to write as much as I possibly can and publish as many books as possible and use this experience to tell anybody that's listening that this whole path is a complete disaster, not just for yourself but the ripple effect it has beyond comprehension.

I have put a cloud over my children's future, which having the same last name as me with my actions. I can say I'm a loving father and all that, but am I if I'm really affecting my children?  So I realize it's too late.  But being gainfully employed through my trades as a pipefitter journeyman.  I have a satellite license.  I have a lot of experience.  I can work for myself or someone else but my true calling, I think, would be to publish books and to speak about them and tell my story that I'm going to be the example what not to do and that I changed my life and, you know, there is a way.

THE COURT:  What are you going to write books about?

THE DEFENDANT:  Since I've been at the ACI, I've written a children's book, complete manuscript, which is done, called "The Butterfly and the Dragon," which is just a story about a dragon that changes his image and his purpose in life with the help of a butterfly, which is unlikely.  I'm lucky that my mother is a teacher and she's told me to turn lemons into lemonade with myself and that writing is therapeutic.

I wrote a collection of short stories called "Growing up New England," and I finished a 900-page manuscript and there's nothing bragging about what I've done.  It's just basically putting the honest truth on the table for everybody to see.

THE COURT:  What's the 900-page manuscript about?

THE DEFENDANT:  It's a memoire of my life, autobiography.  Everything I've went through from going to a private school as a child to starting my own business, to having parents that got divorced and being a teenage father, and then events leading up to why I'm sitting in the ACI and going to federal prison instead of taking care of my children and having the white house with the picket fence.

THE COURT:  So have you submitted any of these things like the children's book, for example, to any

publisher?

THE DEFENDANT:  Well, right now I've just got a book called "Writer's Market" and they say that you have to approach editors and agents but that's once you have a manuscript that's polished and completed so I'm trying to do this the right way.  And this is not something I'm doing for money.  This is something that my mother was a graduate of RISD.  She's an illustrator.  She's a teacher.  And I feel passionate about -- here's an example.  Since I've been incarcerated, my son has taken a nose dive, my oldest son.  His interest in sports, school, everything.  There seems to be a common thread with people who look at crimes like bank robbery as like "The Town" or different movies that Hollywood will say, Yeah, that's -- tell you what, I found firsthand that's all BS.

And I basically just thrown my life away and I could have -- I did damage a lot of other people that I didn't intend to.  I didn't wake up in the morning and say this is what I want to do, I want to hurt these people.  I acted selfishly.  I put myself first and I impacted a lot of people negatively.  And I feel like I could be that one who goes to a penitentiary or I go to a training school and I tell my story.  Yes, I was a federal inmate.  Yes, I robbed banks.  Yes, I was

addicted to drugs.  But I wasn't always like that, and I'm not like that today.  And I feel that through writing I can reach a lot of people.  This is not a novel.  This is my life.

THE COURT:  Okay.  I'm all in favor of what you're doing.  I'm not at all critical of it.  I think it's great.  But what are you going to do to support yourself and your family when you get out?  If you're not doing the writing for money, as you just said, then what is it that you're going to do to support yourself?

THE DEFENDANT:  I will be employed probably before I even get released.  I will be working as a surveillance camera installer.  I will be doing Direct TV Dish Network installations.  I will be doing HVAC work.  I have a Pipefitter Journeyman's Level 2.  I have a telecommunications license.  These would obviously need to be -- I'd have to go back and get my license.  I am a certified law clerk.

THE COURT:  I saw all that in the presentence report that you had these jobs.  You know, a lot of defendants come in here, they commit crimes because they really don't have any other skill or talent. You're kind of unusual in the sense that you actually have the skills and the talent.  You had good jobs. And off you go doing what a lot of people consider to

be the stupidest crime in the book, robbing banks.

THE DEFENDANT:  I agree.

THE COURT:  And I really kind of can't figure that out.  Is it just -- are you attributing that to addiction, or greed, or what?

THE DEFENDANT:  I would absolutely say that I've hit a bottom with addiction.  I don't want to blame addiction by itself and say that I'm a victim, but I've tried every single way to stop being an addict.  Even when I wasn't an addict I felt like I was an addict, if I can say that without having -- I don't know, the mentality, the path that I was on, even my goals in life were tainted.

I was very lucky early on.  I've had a business, and I've had success so I know that I can rise above this but I hate to say this but I needed to hit bottom.  I'm lucky.  I thank God every day that I did not kill somebody or myself or injure somebody that was walking across the street while I was running.  I am so grateful that I'm going to get a second chance and that's why I feel like being gainfully employed, I'll scrub toilets.  I'll work three jobs.  Probation tells me to jump, I'm going to say how high.  Because I'm not -- I've gotten it on my own way.  I realize that life is too short.  I have a handicapped daughter.  I don't

know if she's going to survive this prison sentence. My father is 70 years old.  He came down.  He was here on the 13th.  It got continued.  Oh, well.  He has Hepatitis C.  I don't know if I'll see him again.

I just -- I owe it to my family.  It's not about myself anymore.  And I know because I have a track record, I've worked 80, 90 hour weeks.  I've met quotas.  I became the best Direct TV installer on the East Coast.  I mean, I'm just saying that I could have been a technician, but I started a contracting business.  I did it legally.

I was a felon at 18 years old and they said you're never going to be able to do nothing.  I said, okay, let me go to college.  Let me get a trade.  Let me start a business.

I was a teenage father.  I made a decision to not go in the Marine Corps when I signed up.  I stood with my son.  I don't want a medal for that, but that's what I wanted to do and, you know, my oldest son today, the last time I saw him said, "Thanks, dad, you were always there for me."

I feel like now all for what, now that I'm here. I brought this upon myself.  But I know with a hundred percent confidence that I will -- I'm on a total different path; and being gainfully employed in one of

my trades, I have no problem getting work.  My problem was myself.  And I feel like in the car accident that day, that person died because when I woke up and found out what I was in and what situation I had just went through, I was counting my lucky stars that I didn't -- that could have went ten times worse.

And I have so much gratitude and I have a loving family, people behind me.  This is my time and I'm going to make the best out of this federal sentence.  Even if I go to a penitentiary, I'm going to make the best out of this.  I'm going to stay positive, and I'm going to come out and I'm going to be that one percent.

And I hope to get my addiction certification in the course of this so I can be a counselor since I have all this experience, that would be a very good field for me to get into.

THE COURT:  Okay.  That's all good and I commend you for all the self-reflection and the self-awareness and the energy that you're bringing to all of this.

You sound like somebody who's got that can-do sort of attitude that will help you overcome all these barriers that are in front of you.  So my only recommendation to you is stay focused and keep yourself on track here.

So it sounds like you know what you've got to do

when you get out.  You don't need a lecture from me about it.

There is one thing I want you to do, though, since you are such a good writer and so productive at it and you seem remorseful toward the people that you affected.  I want you to write them a letter, each of them, I want you to write a letter expressing your remorse to them personally.  I don't know if it would help them or not but it might, and I think it would be the right thing to do and I think you certainly have the capability of doing it.  So I would like to see you do that.  I'm going to make that a condition of your supervised release, but I expect you to do it before you get on supervised release.  I expect you to do it right away and supply a copy of what you have written to the -- you can supply it to your attorney who can give it to the court, give it to the clerk and I'll see it, but I'd like to see that you've done that.  All right?

THE DEFENDANT:  Absolutely.

THE COURT:  And I'd like you not to wait until your sentence is over.  I'd like you to do it right away because now is when it's meaningful.

It really is, I don't need to tell you, you know this, but these robberies are really terrorizing to the

tellers and particularly to that one you told that you followed her home and you know where she lives. That's egregious conduct and I think the right thing to do would be for you to express to her the remorse that you're -- you know, you come in here and apologize to me. Well, you didn't rob me, you robbed them. So let's direct a lot of that remorse and energy toward the people that you affected. Okay?

THE DEFENDANT: I agree, your Honor.

THE COURT: I'm going to go ahead and accept the joint recommendation of counsel here. I'm glad they worked out a joint recommendation. I think it's a fair sentence. You seem to be someone who is likely to serve time and get good time off so you'll have a chance of working a year or so off of this, a little more probably off of this sentence.

You're in the ACI. Are you working off a state sentence at this time?

MR. FITZGERALD: No, there is no state sentence, your Honor.

THE COURT: Why is he at the ACI?

MR. FITZGERALD: Originally he was charged by the state.

THE COURT: So he was just never transferred to Wyatt?

MR. FITZGERALD:  That's correct.  My understanding is he's going to be transferred over to Wyatt today, but he's been held just on the federal hold now.

THE COURT:  All right.  So as I said, I'll accept that joint recommendation.  I'm going to give you the three years of supervised release, and we'll wait on the restitution order until we find out how much is actually owed after the forfeiture and to whom it should be paid and we'll issue a separate restitution order after sentencing.

So I think that the recommended sentence for all the reasons that counsel, both counsel have stated is one that meets all of the goals of Section 3553 and is sufficient but not greater than necessary to do that.

So in the matter of the United States versus Scott Niemic, the Defendant is hereby remanded to the custody of the Federal Bureau of Prisons for a term of incarceration of 105 months to be followed by a term of supervised release of three years; restitution as it will be ordered in the future; a special assessment of $500, $100 for each count.

As special conditions of his supervised release, I'm going to require that the Defendant participate in a program of substance abuse treatment, substance abuse

testing up to 72 drug tests per year and that he shall be required to pay the cost of that treatment and testing based on his ability to pay as determined by the Probation Office.

I'm further going to order that the Defendant write letters of apology to each of the tellers involved in the five robberies, and he shall do that immediately as soon as the information is made available to him.

And finally, there's no fine in this matter.

I believe your plea agreement waived your right to appeal if the sentence was within the guideline range or below; is that correct?

MR. FITZGERALD:  That's correct.

THE COURT:  So the right to appeal is waived.

Is there anything further that we need to take up?

MR. FITZGERALD:  Your Honor, if you could recommend --

THE COURT:  The RDAP program.

MR. FITZGERALD:  Yes, please.

THE COURT:  Were you also requesting that he be incarcerated as close in proximity to Maine, was it?

MR. FITZGERALD:  Well, I think his father had said he wanted him close to Maine in one of the letters

and certainly the New Hampshire facility is close to Maine; but, primarily, from the way Scott is looking at it, he wants to be as close to his daughter as he can, who is here.

Seekonk?

THE DEFENDANT:  Westport.

THE COURT:  It's not my call but it's the Bureau of Prisons' call, but I'll request that you be incarcerated as close to your home as possible.  And I will recommend the RDAP program for you, although, again, that's something the Bureau of Prisons will determine.

You need to move to dismiss --

MR. DALY:  The related indictment, your Honor, 12-148-S, make an oral motion to dismiss that.  I'll provide an order to the Court.

THE COURT:  I'll grant that motion.  I'll also grant your motion for forfeiture of the funds that were seized.

MR. DALY:  Thank you, your Honor.

THE COURT:  Okay.  Thank you.

THE DEFENDANT:  Thank you, your Honor.

MR. FITZGERALD:  Thank you.

(Adjourned at 2:45 p.m.)

C E R T I F I C A T I O N

I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Anne M. Clayton

_____

Anne M. Clayton, RPR

July 23, 2018

_____

Date